Case No. 13-7082 at Elm, David Harvey individually and as personal representative of the Estate of Curtis Suggs v. District of Columbia Appellant. Mr. Schifferle for the Appellant Cross-Appellee, D.C. Mr. Fiedler for Appellee Cross-Appellant, David Harvey. Mr. Schifferle for Appellee Cross-Appellant, David Harvey. Good morning. Good morning. May it please the Court, Carl Schifferle for the District of Columbia. I would like to say three minutes for rebuttal. The District, not the Plaintiff, was entitled to summary judgment on the Plaintiff's substantive due process claims, which lack three necessary elements, a special relationship, subject of delivered indifference, and a municipal policy. Meanwhile, D.C. Code 12309 barred the statutory negligence claims, and also the evidence was insufficient as to the statutory claim. And even assuming the Plaintiff had somehow established liability as a matter of law, the District would still be entitled to a new trial on damages and to equal contribution against the settling codefendant. On the Fifth Amendment claim, there was no special relationship. We submit because there was not institutionalization or the equivalent of institutionalization, which is the type of restraint that would be required for the existence of a special relationship. Mr. Suggs lived in a private home in the community at all times. How is this different than Youngberg?  How is this different than Youngberg? Well, institutionalization would be one essential difference, Your Honor, that in Youngberg, the individual resided at an institution as Mr. Suggs had at Forest Haven, an institution that's separate and isolated from the community. In this case, Mr. Suggs was in a private home, living in the community in the least restrictive environment that was possible to provide him the services. So is it your argument that once Forest Haven was done, the District doesn't have a special relationship with any of the folks that it previously had a special relationship with? Is that one of the consequences of the Forest Haven litigation? Yes, Your Honor. I mean, institutionalization is one key background, so we would agree with that. But also look at the facts of the situation that he moved to. That seems a little odd to me, doesn't it? I mean, I'm not certain that the courts that were involved in that had that in mind, right? I mean, going from a situation where there was a special relationship, trying to address horrendous problems, one of the results of that was to say that that special relationship between the District and the patients no longer exists? That's a way to address this special problem? Well, respectfully, yes, Your Honor. That's because the goal here was a major transformation of the system. It was from institutionalization to... I didn't think so. Well, it's not to say that the District doesn't have a duty under District law, for example, to provide services, but it goes to the question of whether there is a special relationship. DeShaney says it's incarceration, institutionalization, or similar type restraint, which is simply not present in this case. In an institution, for example, the individual is isolated from the community and is dependent on services directly from those in the institution. But in this case... Wasn't the plaintiff, DeShaney, here dependent upon the... You know, you want to use the word institution, but on the provider? Wasn't he dependent? Right. Well, there was the group home provider, which was not a state actor. It was a private entity. He had his own private doctors, own professionals that were contracted for him by the private group home operator. The District did not limit his care or assistance from any source. Because he was in a private home in a community, he could have his own visitors, his own family come at any time, his own doctors come at any time. The District had no involvement? Did the District contract with a private home owner? The District certainly did, yes, Your Honor. That doesn't take us back to where we were in the last case, if you were around then. Can a state get out of being a state actor by contracting somebody else to do it for him? Well, not necessarily. But in this case, yes. There's no dispute here that Semrel, the group home operator, was not a state actor. The District Court specifically found the plaintiff accepts and actually relies upon that finding. Did anything in the D.C. Code governing commitment and District responsibility for individuals change when the state-run facility was closed? Well, as I said, I mean, the entire system sort of transformed. No, but did the laws change? Did the actual code provisions change? Well, the specific act to protect the rights of the intellectually disabled, that was enacted in 1979. It was part of the process by which deinstitutionalization had already begun in light of the consent decree in 1978 in Evans. So it was part of an evolution of the process. Did the statute, the code provisions change? Is that the answer? So, yes. The code provisions did change. It wasn't just that the District decided to shut down. Well, I understand that there was litigation going on, but that the facility closed down and then the care was contracted out to private facilities. It's actually that the legal architecture, the laws that governed, changed. Yes, Your Honor. There was the 1979 Act. There was the whole system of licensing. What was the change in the 79 Act that is relevant to the existence of a special relationship? It was the move to deinstitutionalization, the requirement that it be the least restrictive environment, the vision that services would be provided in the community. That was a key purpose of the Act. And so the requirement of an annual IHP, individual habilitation plan, the comprehensive evaluation, this was a shift from institutionalization and the government providing the services and controlling the services to a least restrictive environment where the individuals in the community, their services are being provided by private. So if he doesn't develop to a point that he's competent, even in the ex-post world where we're in the private facility,  he can't be discharged unless a court sanctions his discharge. Is that right? That may be technically true, but our point is that... What's technical about that? Why is that technical? Because he can't, in other words, the district is responsible for his care. He's committed. He can't be discharged from that commitment unless, I take it, his family and the court join and say that that's okay. Well, his admission was at the request of his family, so his family was always free at any time to take them back into its own care or make alternative living arrangements. The court could not prevent that, and nothing in the law could prevent that. Additionally, the D.C. Code also recognizes the group home director... And was that equally true when it was a public facility? Was that also true... In other words, the family... That, yes. In fact, we have evidence from Mr. Sykes' sister, Ms. Weaver, that she would, whenever she wanted, even at the time Mr. Sykes was at Forest Haven, she would go there and take him back into her care. Right, so the fact that the family could take him out, nothing of consequence changed from the time that it was a public facility when you acknowledged that there was a special relationship to the time that it became a private facility when you contend that it was no longer a special relationship. That's true. I mean, we're not relying just on that point, obviously, to argue that there was no special relationship here. But the fact is that there was no limitation at all that was imposed upon Mr. Suggs by the district. Any limitation was that of his condition, which the district did nothing to cause. And so there's nothing that the district did or failed to do that resulted in any limitation on Mr. Suggs. The family could always request, and in fact did, take him back into his care whenever the family wished. And so for that reason, there's no special relationship. The second element is that there was no deliberate indifference here, subject of deliberate indifference, which is another required element. There's no evidence that the case manager, the district employee case manager, knew of and disregarded an excessive risk to Mr. Suggs' health. She was not a health care professional. Mr. Suggs had his own doctor and his own team of professionals which were tending to him. She was not responsible for his day-to-day care, only to visit four times a year. In order for deliberate indifference to mean something, and something more than negligence, which is required, then these facts here simply do not rise to the level of deliberate indifference. Mr. Suggs received numerous appointments with neurologists and neurosurgeons. The team considered the surgical recommendation, decided for a second opinion. Again, these are reasonable acts, not acts of deliberate indifference. We have Ms. Weaver's own refusal to consent to the surgery, which again supports the fact that... That timeline on that, when was the surgery first recommended? The surgical consult was first recommended. The surgical consult was in September of 1995 by a physical therapist at the day program that he attended. And when was the point at which Ms. Weaver did not consent? That's somewhat of a factual dispute. It was at least 1998. The minimum of three years, and perhaps more, between the time the consult was recommended but not followed through and the time at which Ms. Weaver did not consent. That would be correct, Your Honor, but... That could have been... In fact, the record would seem to support the proposition that his condition deteriorated during the period between the failure to follow through on the consult and Ms. Weaver's dispute, right? Right. There may be a factual dispute there. But the question is whether Ms. Jane... No factual dispute. I mean, it seems like the record would support probably his condition deteriorating the whole time, wouldn't it? Well, there was testimony of Dr. Falick, who was a neurosurgeon, and he opined that surgery would not have benefited Mr. Suggs because... But one thing to not consent at the time of the consult not being followed through on and to not consent some years later. That's two different things, isn't it? Yes, I understand that, Your Honor. I understand that. But the test is deliberate indifference by Ms. Jenkins. There are lots of actors involved, including private actors. It has to be specifically her deliberate indifference, which would be the subject of deliberate indifference that would be necessary for the claim. There's also no municipal policy in this case. Another... How about practice? Or practice, Your Honor. There was the 1979 legislation, for example, which district policymakers, the council, enacted specifically to provide protections for individuals with intellectual disabilities and included judicially enforceable rights. That was after the litigation, right? That was after the evidence... Before a claim in litigation, yes. Yes, that was after the evidence suit was brought, but it shows that the district acted in response to... It doesn't necessarily show that it was successful with respect to the practice. Well, I don't think that is the test, respectfully, until it's not only that there was... You can't just say, well, we passed a law saying we're not going to follow that practice anymore and then go ahead and follow the practice. If it were a meaningless law, I would agree with that, but the fact is the test is whether the municipality did not act in response to what it was on notice of, that is, notice that constitutional violations were likely. I'm taking that language directly from the Jones decision of this court. There was also the licensing standards that were adopted by the district for these private homes. Those were strong standards. There's no question here that they were effective standards. Why do you think the standard is subjective deliberative indifference? Where do you get that from? Well, I'm going back then to the predicate constitutional violation, which does require subjective deliberative indifference. Wait, where do you get that from? That's the Eighth Amendment standard. I thought Youngberg told us that the Eighth Amendment standard doesn't necessarily apply. It doesn't apply here. Well, there was no dispute when this was briefed below on summary judgment that the former subjective deliberate indifference standard applied. We cited it specifically to the pages of the plaintiff's summary judgment papers where that standard was used and followed. So that was, I think, the accepted test, and so this Court should not, we submit, permit plaintiffs to argue on appeal some different standard. But in any event, there are the cases that we cited in our brief, the Caiozo case from the Second Circuit, the Doe case from the Fifth Circuit, McGee, Moore, Ray. These are cases from other circuits where they extended the subjective deliberate indifference test beyond just the Eighth Amendment context to pretrial detainees, to civilly committed detainees. So we believe that not only was any such claim forfeited, that subjective deliberate indifference was not the test, but it's well supported by the case law as well. And I see that I am into my rebuttal time. Unless there are further questions, I would like to save some time. Thank you. Thank you. Good morning, Your Honor. Good morning. My name is Mark Fiedler. I represent the appellee, David Harvey. I'd like to respond to some of the issues that were raised in the appellant's argument. First, as to the claim or the contention that there was no institutionalization once Curtis Subs was placed in a group home. Three quick points. First, the dictionary definition is a place where an organization takes care of people for usually a long period of time. That would certainly apply to a group home. Second, in the contract that the district had with CIMBRL, which was the operator of the group home, it described in the contract the services that CIMBRL was to perform as, quote, institution, unquote. And third, in Evans, the district admitted that the group homes had become, by virtue of the dysfunction of the murder system, mini forest havens. So it may have been a smaller facility, and it may have been out in the community, and it may have been owned by a private entity, but it was still, if not an institution, then at least analogous to an institution as referenced in DeShaney. As to the point that he could be discharged at the family's request, no, he couldn't. As a factual matter or as a legal matter, let's start with the legal matter. The 1978 Act specified circumstances under which a family could seek the discharge of a family member. But that applies only to the parent or the guardian who could make that request. His parents were deceased. His sister and his cousin, Mr. Harvey, were not ever appointed his guardian. So under that statute, they couldn't ask. As a factual matter, there is record evidence that his sister, Carrie Weaver, had asked years before, I think it was 1997, there are notes, and maybe even 1993, that she wanted him returned to South Carolina. He wasn't returned to South Carolina. This is not a situation where he was free to go. What typically happens, as a practical matter, what typically happens in this situation then if the governing law requires parents or a guardian and there are no parents and no guardian has been named? Is it in fact true that we're just caught in a state of perpetual institutionalization without any avenue for voluntarily overcoming that status? I'm entering speculation land a bit here. But I would imagine that the family could go to court to have a member appointed as a guardian. But again, that's not as simple as making a phone call, you know, please release Curtis tomorrow, or just pulling up a van, packing up his stuff and leaving. There's not any sort of periodic, I guess I should have asked the opposing counsel this, but you're the one that's here right now. There's not any sort of periodic automatic review of committed persons to determine if they still should be committed. Thank you for raising that, because under the 1978 Act that's required. It was done here. And a Superior Court judge each year reviewed and decided whether to continue his, quote, commitment, unquote. The 1978 Act expressly defines commitment as being without the individual's consent. So in no fashion was this a voluntary commitment. The counsel of the district made that clear in its report discussing the statute. There is admission, which is voluntary. There is commitment, which is involuntary. So I think it's abundantly clear that there was a substantive due process duty owed to Curtis Subbs as to what the proper standard should be for determining the underlying constitutional violation. I want to make it abundantly clear that in the trial court, counsel for Mr. Harvey never cited a subjective, deliberate, indifferent standard. Yes, in the papers, Farmer was cited, but for a completely separate proposition, namely that the constitutional violation had to be sufficiently serious. That's an objective standard. There was never an argument or an admission that the Farmer's subjective, deliberate, indifferent standard should apply. As to which standard should apply, we would submit that an objective, deliberate, indifferent standard would be appropriate, largely for the reasons that Judge Griffith stated before in his question namely that Youngberg indicated that persons such as Mr. Subbs were involuntarily committed are entitled to more favorable treatment than prisoners under the Eighth Amendment. And also, in Farmer itself, it acknowledged that it's impractical and inapplicable to apply a subjective standard to an institution or a municipality. It makes sense if there is a claim of official liability under 1983. What about using Youngberg's professional judgment standard? The same problem would apply. Which profession? Our claim doesn't rely solely on the wrong or the deliberate indifference of Sarah Jenkins. Other individuals were also involved. The bureau chief and so forth. So which profession? Hers? The bureau chiefs? Other people in the chain of command? That's one of the reasons why this was an action against the municipality and not against any particular individual. More than one person that was responsible here. And so possibly, I don't think the professional judgment standard is the same reason that Farmer said the subjective deliberate indifference standard doesn't make sense when talking about a municipality. Same thing would hold true for the professional judgment standard. We argued in our brief that regardless, the evidence would support a finding of subjective deliberate indifference. But if the court were to explore which standard should apply, we believe it should be an objective deliberate indifference standard. So on this question, in order to warrant the entry of summary judgment in your favor, we'd have to conclude, as the district court did, that there's no reasonable juror that could find against you. On the record produced on summary judgment. Right. And that's the problem. I understand that this is a bit of an unusual case where summary judgment is granted to the plaintiff on a 19-8 brief. Against the municipality who? But the issue here is that the district failed at the summary judgment stage to effectively controvert the evidence presented by the plaintiffs. For example, on the issue of custom of deliberate indifference by the district, evidence was submitted of court monitor reports saying that class members were not receiving adequate medical care. And that was cited and evidence was supplied in the statement of undisputed material facts in support of the plaintiff's motion for summary judgment. In response, the district said, and I quote, irrelevant. Where's the evidence to controvert it? On the issue of Jenkins and whether she acted with deliberate indifference, evidence was supplied, particularly of her notes, indicating that she was aware that Mr. Suggs was in declining health and was aware of the need for the neurological evaluation. And the response of the district was, her notes say what her notes say. But wasn't there at least some evidence in the record that would – it's not to say that judgment should have been entered against you on the question of whether it should have gone to a jury. Wasn't there at least some evidence in the record that would support the proposition, perhaps a jury might ultimately rule in your favor, but that would at least get the district to the jury to the effect that the deteriorating physical condition came about because of his cerebral palsy and that there were questions as to whether surgery was advisable given his age and the risks that were entailed by surgery in light of the nature of the advanced state of his condition. But that wasn't raised, at least not properly, at the summary judgment stage. And so much of that, much of those arguments were weighed. And that's the problem. It's not that at a metaphysical level there may not be some evidence that could have supported that. It just wasn't presented to the court on summary judgment. And what do you mean by that? In the opposition to summary judgment? Correct. There was just no reference to that at all? Or at least no admissible evidence submitted or cited that would support the conclusion that the district didn't act with deliberate indifference or that his death and declining health wasn't caused by the failure to follow up on the medical recommendations? But was, for example, Dr. Plotkin, so was his statement to the effect that some people with cerebral palsy have late progression with decreasing tone and loss of ambulation, was that not in the summary judgment record? Because that would at least conceivably support the proposition that the deterioration of the condition was due to cerebral palsy. You may be referring to his initial consult where he asked for the MRI to be done to get to the bottom of that to determine what, I think he listed several possible diagnoses. Yeah, he did. Then he said, let's get an MRI to determine what's going on. Once the MRI showed that there was cervical stenosis, he then said, well, let's run it by a neurosurgeon to see if surgery would be appropriate here. And although there were enormous delays in getting all that done, the neurosurgeon said, yeah, there's cervical stenosis here and surgery would be recommended within the next few weeks. And Plotkin then filed, a month later said, when the surgery still wasn't done, a month later said, surgery ASAP. Which means that the issue of maybe it was something else that was causing this is now by the courts. Unless the court has... Your cross appeal, is that still before us? Nobody's mentioned that at all. Pardon me? Your cross appeal? We're going to withdraw that. I thought that was probably a good idea. Okay. The contribution issue that the appellant is raising, I'm not sure what... Do you have a position on that? The issue beyond what we presented in the brief, I would only say that allowing the district to take a 50% credit on the settlement with Symbryl would be inequitable because the district's liability was so much more egregious than Symbryl, but also it would discourage claims from settling in these kinds of circumstances which is contrary to the salutary policy of encouraging settlement. Can I ask a question about the statute, the D.C. negligence statutory claims? So what's your argument as to why the notice provision, the 12-309 provision, doesn't bar those claims in light of the way that D.C. courts have construed that, particularly in the Brown decision? Well, in terms of the timing... Yeah, on the timing, just on timing. Yeah, I'm not talking about the adequacy of the... Again, the district asked the court under 12-309, and the relief that it sought was to bar claims for injuries before December 23, 1999. And that's what the court granted. Now the district is arguing but that after that ruling, Judge Lamberth clarified his ruling on deliberate indifference to say the deliberate indifference under the 1983 claim was from 1995 to 1998. The district then came in and said, wait a minute, if the wrongdoing was 1995 to 1998, then your ruling on 12-309 being from December 23, 1999 and after is inapplicable. But that's wrong for two reasons. One, the clarification by Judge Lamberth applied to the 1983 claim, not the negligence claim. And second, his clarification went to the timing of the district's wrongdoing, whereas 12-309 is concerned with the timing of the injury, which Brown points out, it wasn't when the doctor misdiagnosed, it's when the plaintiff suffered the consequences. And that's on the face of 12-309. It's when the injury occurred, not when the wrongdoing occurred. So there's a disconnect. So as a consequence, the district is barred from presenting an argument now that Judge Lamberth was wrong in his ruling for adhering to the district's position. He gave them exactly what they wanted. It necessarily goes to the district's conduct. I know that the letter of 12-309 refers to injury, but it has to be the injury that's caused by the alleged misconduct on the part of the district. Yes. And under Brown, it seems like then the fact that the injury may have manifestations subsequently isn't what gives rise to the – it doesn't prolong the period within which the claim has to be brought. For the sake of argument, if Brown had been raised at the district court level, we would be in a very different position. But they didn't raise it. So you think if Brown did apply, if – I take it you – I understand that you're making an argument. They made a procedural argument rather than a substantive 12-309. Argument 12-309 is not jurisdictional, so this court is held. So they waived it. They waived the argument they're trying to make now. But I don't – I don't know the procedural history of this, but do you have to invoke a decision? If you make the argument and then you have a decision later that supports the argument, haven't you preserved the argument? They didn't make the argument. They didn't make the argument at all. It's your position. Like I said, they said December 2399 and on is the only thing that he could recover under 12-309. And Judge Lambert said, yes, that's right. Okay. If there are no other questions, we would urge the court to affirm the judgment. Thank you very much. Thank you. Mr. Peter. At a minimum, there are genuine issues on the claims of substantive due process and the other claims as well, whether there was subjective deliberate indifference, whether there was a municipal policy, whether that municipal policy has an affirmative link to the damages claimed in the case. These are demanding standards that are imposed. In order for them to mean something more than negligence and respond to yet superior liability, we think that we're entitled to summary judgment. But at the very least, that makes it a jury issue. It's not only a high standard, but whatever inferences from the evidence would have to be drawn in the district's favor. And based on the record in this case, which is what the district court judge decided summary judgment on, not any sort of waiver issue, there was certainly evidence. There was Dr. Falick's testimony that I mentioned that Mr. Suggs would not have benefited from surgery. There was evidence of the team's view of the surgical recommendation. They thought that the risk would outweigh the benefits in light of Mr. Suggs' age. There's Ms. Weaver's own refusal to consent to the surgery, which makes it reasonable not to have provided the surgery. There was a new argument raised. Did you rely on this in your opposition to summary judgment? Yes. You know, I can't point to specific places, but certainly it was in the summary judgment papers, and that record evidence was included in the record at summary judgment. There was also, and the plaintiff has the burden of proof. The fact that it means that they're not entitled to judgment is a matter of law, and the jury could simply discredit the plaintiff's evidence. There's no need even for the district to present affirmative evidence, but it was there. There was a new argument just raised about whether the family could have asked for Mr. Suggs to be released. That was not an argument that was made in the briefs. It's always been the district's position, which was not contested, that the family could always take him back into his care at any time. Well, you make that proposition, and I raised the question. It would not come with a new argument on behalf of the FLE. It was my question in responding to, but aren't you misstating the state of the law to say that the family could take him back at any time? Wouldn't it take a process for them to have taken him out of the commitment? If he's committed, and he is. That's why I said I think technically either there would be a court order required or the statute also provides the group home director could release the individual, even without a court order, as long as there was notice and an opportunity to object. But as a factual matter as well, we know that Ms. Weaver would take Mr. Suggs back into her care. And even at the time, back in 2000, when Mr. Harvey, who had power of attorney, represented, requested that Mr. Suggs be moved to South Carolina, the district implemented that request, actually went down to South Carolina, visited nursing homes there, wait-listed him on several. So it's clear from the factual record as well that there was no limitation on the family's ability to take Mr. Suggs back into his care. On the delivered indifference standard, I think that we kind of did argue below that it was a subjective delivered indifference standard. At the very least, they did not articulate below an objective delivered indifference standard as an alternative, and so that would be improper now to raise it on appeal. If I could just stress the 12309. Your time is up. Okay. Sorry. Thank you very much. Case is submitted.
judges: Griffith, Srinivasan, Sentelle